**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**Robert R. Rice,**
                         **Plaintiff,**        **1:04-CV-0481**
     **vs.**                                     **(NAM/DRH)**

**Harley Davidson Inc.,; Buell Motorcycle**
**Company, LLC; and Buell Distribution**
**Company, LLC,**
                         **Defendants.**
_____

APPEARANCES:                                   OF COUNSEL:

Cade & Saunders, P.C.                      Alan M. Blumenkopf, Esq.
4 Pine Street                                         William J. Cade, Esq.
Albany, New York 12207
Attorneys for Plaintiff

Hanlon, Veloce & Wilkinson              Christine D'Addio Hanlon, Esq.
7 Executive Center Drive
Albany, New York 12203
Attorney for Defendants

**Norman A. Mordue, Chief U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

This matter has been the subject of a previous Memorandum-Decision and Order by this Court, familiarity with which is assumed. *See, Rice v. Harley Davidson, Inc.*, 2005 WL 1843250 (N.D.N.Y. August 1, 2005) (not reported in F. Supp.2d). To summarize briefly, plaintiff was injured while "test riding" a XB9S motorcycle manufactured by defendant Buell at an Americade motorcycle rally in Lake George, New York. Defendants moved previously for summary judgment on the basis of a release which plaintiff executed prior to embarking on the demonstration ride of the motorcycle. In its prior decision herein, the Court found that the language of the release "expresse[d] in unequivocal and clear terms the intention of the parties to

relieve defendants from liability caused by defendants' negligence." The release, however, by its terms, did not relieve defendants of liability for intentional conduct. The Court determined previously that the release was enforceable against plaintiff, barring his claims against defendants, unless plaintiff could "demonstrate that [the release] is void under the New York General Obligations Law §5-326 or that defendants' actions in conducting the test-ride amounted to gross negligence." Defendants now move again for summary judgment on the ground that the release is not void under the General Obligations Law and there is no evidence of gross negligence on their part in causing or contributing to plaintiff's accident.

**II.     DISCUSSION**

A.     <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is

2

sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. Cir. 1985). It is with these considerations in mind that the Court addresses the parties' motions for summary judgment.

B.    Application of General Obligations Law § 5-326

As previously noted by the Court, N.Y. Gen. Obl. Law §5-326 provides as follows:

> Every covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

The statute voids any agreement which purports to exempt owners or operators from liability when a fee or other compensation is paid for the use of a facility. *See Howell v. Dundee Fair Ass'n*, 73 N.Y.2d 804, 805 (N.Y. 1988). This Court previously found that material issues of fact existed with respect to whether defendants: (1) received compensation for providing plaintiff with a test-ride; and (2) qualified as "operators" of a place of "amusement" or "recreation" within the meaning of Gen. Obl. Law § 5-326.

Specifically, in connection with latter issue, the Court noted there was no evidence in the record Court regarding the contractual relationship between Americade and defendants. As an answer to this question, defendants have submitted the affidavit of William Dutcher, president and CEO of Americade, who states that Harley Davidson and Buell operate "independent from Americade." To wit, Dutcher states that no contractual or other arrangements exist between Americade and defendants for demonstration rides. Morever, Americade "does not pay, and has never paid Harley Davidson or Buell in any way, shape or form, relating to demo rides or

3

anything else." According to Dutcher, defendants receive no assistance or direction from Americade in obtaining permits or setting up their demonstration rides. Indeed, Harley Davidson and Buell operate their ride demonstrations "off the Americade premises." The rides are set up at the Fort William Henry Hotel, property which is not "remotely or directly within the control of Americade."

Thus, defendants have demonstrated in support of their motion, that even after conducting discovery on these issues, there is no evidence which demonstrates Harley Davidson, Inc. or Buell Motorcycle Co., were owners or operators of a "place of amusement or recreation" within the meaning of Gen. Obl. Law § 5-326. Plaintiff has not opposed this portion of defendants' motion with contrary evidentiary submissions. Rather, plaintiff argues that pursuant to "common sense" and the definition of "amusement" in the Webster's New Twentieth Century Dictionary, defendants created and operated a place of amusement and recreation. Contrary to plaintiff's arguments, **none** of the New York state courts referenced in his memorandum of law have deemed "activities organized and operated under similar circumstances" to be "recreational activities pursuant to § 5-326. The Court concludes, however, that even if these defendants could be considered "owners or operators" of a recreational or amusement facility, there is no proof in the record that they "receive[d] a fee" of any kind in this case.

As referenced above, defendants received no fee or compensation from Americade for operating demonstration rides as part of the Americade event. Moreover, plaintiff acknowledged during his deposition that he paid no fee to "test ride" a Buell motorcycle. The only evidence plaintiff puts forth in support of his claim that defendants received a fee in this case is that plaintiff was required to provide his name, address, telephone number and driver's licence number prior to being allowed to participate in the demonstration ride. The information form

4

plaintiff completed prior to his ride also asked whether he intended to purchase a motorcycle in the future and if so, when. It is undisputed that plaintiff provided the required information and answered "1-2 years" in response to the question of when he intended to purchase a motorcycle. According to plaintiff, his release of this "personal marketing and sales" information to defendants is a commercial benefit since it allowed defendants to contact plaintiff "to advertise, promote and sell their motorcycles."

As proof of this claim, plaintiff's attorney has submitted his own factual affidavit which details his "undercover" efforts to expose the manner in which defendants promote marketing and advertising of their products at motorcycle rallies. To wit, Mr. Cade avers that he traveled to the International Speedway in Daytona, Florida where defendant Buell was conducting demonstration rides. At the Speedway, Mr. Cade asked a Buell employee how he could participate in a demonstration ride and was given the "exact form" plaintiff was also asked to complete prior to undertaking a motorcycle "test ride." Thereafter, on June 2, 2006, 88 days after he participated in the test ride and indicated on his form that he was interested in purchasing a motorcycle "within 3 months," Mr. Cade avers that he received a packet of advertising information from Buell, along with the name of the Harley Davidson/Buell dealership in Albany, New York, where Mr. Cade resides.

In the first instance, the Court notes that evidence what advertising materials anyone received following a demonstration ride at the Daytona International Speedway in March 2006 is hardly proof of what commercial benefit, if any, inured to defendants based on plaintiff's "test ride" of a Buell motorcycle in June 2003, at an Americade rally in Lake George, New York. Secondly, even if the evidence presented by Mr. Cade was **actually relevant** to events which occurred nearly three years earlier, it is legally of no moment. The Court is not persuaded by

5

plaintiff's contention that the alleged "personal marketing and sales" information he provided to Buell equates to an actual financial benefit flowing to defendants. There is no evidence or even claim that plaintiff received any marketing materials from defendants following his demonstration ride. Further, even if plaintiff had received such materials, the Court would have no basis for determining the commercial value of the solicitation, if any, to defendants, particularly in the absence of an actual motorcycle purchase by plaintiff. Plaintiff cites no legal authority, nor has the Court located any, wherein a participant's provision of information which arguably constitutes "marketing data" was deemed to constitute payment of "compensation" within the meaning of the General Obligations Law. In the absence of evidence that New York courts would so stretch the definition of "receives a fee" under the General Obligations Law, this Court is not inclined to do so. Based thereupon, the Court finds that the release in this case is enforceable by defendants in connection with any claims premised on ordinary negligence.

Finally, the Court notes that since the evidence submitted by Mr. Cade has been disregarded, it is not necessary to conduct disqualification proceedings based on Mr. Cade's efforts to conduct clandestine discovery in this case. *See W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it."). However, the Court can presume from the failure of Mr. Cade to mention it, that he did not advise the Buell employee at the Daytona International Speedway that he was an attorney representing a plaintiff in a lawsuit in which Buell was a defendant. To state that it is highly questionable for an attorney to insert himself intentionally as a fact witness on a critical and contested legal issue in a case where he is counsel of record is an understatement.[1]

---

[1] Defendants cite Mr. Cade's apparent violation of the "ethical precept" which prohibits a lawyer from communicating with an adverse party he knows to be represented by counsel. This argument contemplates New York's Code of Professional Responsibility, Canon 7, Disciplinary Rules, DR 7-104(A)(1), which provides in pertinent part:

6

C.      Evidence of Gross Negligence

As referenced in the Court's previous decision, the lawful release in this case will not shield defendants from proof of intentional conduct which caused or contributed to plaintiff's injuries. Plaintiff asserts that defendants' intentional, reckless and grossly negligent actions were the proximate cause of his accident. Gross negligence is defined as a "conduct that evinces a reckless disregard for the rights of others" or "smacks of intentional wrongdoing." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992) (citing *Kalisch-Jarcho, Inc. v. City of New York*, 58 NY2d 377, 385 (1983); RESTATEMENT [SECOND] OF CONTRACTS § 195).  Review of the record reveals that plaintiff falls short of demonstrating that defendants' alleged intentional or grossly negligent wrongdoing caused or contributed to his tragic accident.

Plaintiff claims that defendants conducted "poorly organized and supervised

---

> During the course of his representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate with a party [the lawyer] knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

While "[p]revailing norms of legal practice prevent a lawyer from communicating with a party, rather than a lawyer," *see Moran v. Burbine*, 475 U.S. 412, 464 n. 53 (1986), and DR 7-104(A0(1) "applies equally to lawyers involved in the prosecution of criminal cases as in civil cases," *see id.*, it is not clear that the "Buell employee" with whom Mr. Cade conversed would be considered a "party" within the meaning of DR 7-104(A)(1). *See Miano v. AC & R Advertising, Inc.*, 148 F.R.D. 68, 77 (S.D.N.Y. 1993) ("party" includes senior management as well as corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation or are or are imputed to the corporation for purposes of liability") (citing *Niesig v. Team I*, 76 N.Y.2d 363, 373-74 (N.Y. 1990)). Nevertheless, it is indisputable that Mr. Cade took deliberate action(s) which rendered him a fact witness in his own case, a scenario expressly prohibited by DR 5-102:

> (a) A lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client, except that the lawyer may act as an advocate and also testify:
> 　　(1) If the testimony will relate solely to an uncontested issue.
> 　　(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
> 　　(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client.
> 　　(4) As to any matter, if disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case.

The "object of this precept is to avoid putting a lawyer in the obviously embarrassing predicament of testifying and then having to argue the credibility and effect of his own testimony." *U.S. v. Jamil,* 707 F.2d 638, 645 n. 5 (2d Cir. 1983) (citation omitted). It is not apparent that any of exceptions set forth in DR 5-102 would apply to excuse or explain Mr. Cade's surreptitious investigation of defendants' demonstration ride practices.

7

demonstration rides to [sic] the public" and "failed to implement measures to protect the safety and well being of the members of the public who participated in their demonstration rides." It is undisputed that plaintiff was one of eight riders of Buell motorcycles in a group demonstration ride at the time of his accident. The group was accompanied by a lead and trail rider, both Buell employees. The demonstration ride route began in the parking lot of the Fort William Henry Hotel, proceeded through the village of Lake George, continued on a long straight road and then descended down a "curvy road" known as Diamond Point Road toward Lake George itself.

Plaintiff submitted an affidavit in which he states he has no memory of the demonstration ride or the accident itself. However, plaintiff does aver that he had never ridden a Buell motorcycle prior to the date of the accident and he "did not know that the Buell was a high performance motorcycle with acceleration, braking, top speed and responsive handling well above the motorcycles [he] had previously driven." After leaving the Village of Lake George, plaintiff stated that "the Buell factory rider accelerated his motorcycle at a high rate of speed on Diamond Point Road." Plaintiff said he felt "uncomfortable" with the speed the factory rider was traveling but he "did not know where [the group] was going and felt compelled to try and keep up with im so as not to get lost." While traveling on Diamond Point Road, plaintiff "observed brake lights come on" the motorcycles of the riders in front of him and "they appeared to be turning to the right."

Several of the riders who participated in the same demonstration ride as plaintiff as well as other rides throughout the day have submitted affidavits in opposition to defendants' motion and have offered observations about the actions or inactions of the Buell lead and trail riders on the date of the accident. However, participant Timothy Rieseler, who completed two Buell "test rides" on the date of the accident, was the only eye witness to plaintiff's eventual crash. According to Rieseler, plaintiff's crash occurred when he attempted to negotiate a right hand

8

curve on Diamond Point Road. Specifically, Reiseler averred that plaintiff "entered the curve and drifted to the left, crossed the oncoming lane and lost control of the bike on the gravel shoulder of the oncoming lane." Although Mr. Reiseler stated that he had accelerated on the long straightaway before the right hand curve in the road, he did not offer any observations about the speed of plaintiff's motorcycle either before or at the time of the crash. Reiseler opined that during both his first and second demonstration rides, the Buell lead and trail riders traveled at speeds "in excess of eighty miles per hour on portions of the straightaway road and in excess of sixty miles per hour going into the curved portions of Diamond Point Road."

According to plaintiff's accident reconstruction expert, Kai Baumann, defendants failed to "control the [demonstration ride] group's activities while underway." Baumann argues that "the [demonstration ride] group disintegrated and essentially became a strung out series of individuals on Diamond Point Road trying to keep pace with Buell's lead rider. . . . This resulted from the leader setting a blistering pace that greatly exceeded the speed limit and skill levels of those following him." Specifically, Baumann contends that defendants evidenced intentional misconduct and reckless or "grossly negligent behavior in the following ways:" 1) defendants "placed Mr. Rice" on a high performance motorcycle which had unusual features and handled and performed differently than other motorcycles plaintiff had ridden in the previous 40 years; 2) Buell's lead and trail riders did not have the experience, qualifications or training to be in charge of a group demonstration ride; 3) defendants did not follow proper procedures for conducting group motorcycle rides and violated procedures set forth by the Motorcycle Safety Foundation, the New York State Department of Motor Vehicles, the United States Department of Transportation and their own recommended guidelines for group riding; 4) Buell failed to provide the lead and trail riders with communication gear so they could talk to each other; 5) Buell failed to train its lead and trail riders in basic emergency first aid; 6) Buell failed to check each rider's

9

helmet for fit and secure condition; 7) Buell's lead and trail riders intentionally and deliberately violated the law by exceeding 30 mph advisory signs and the posted speed limit of 45 mph on Diamond Point Road; and 8) Diamond Point Road was an inappropriate road to conduct a demonstration ride given its downhill and curvy nature which can "spook" and unfamiliar rider.

Mr. Baumann's affidavit was prepared after reviewing all available evidence concerning the accident including his own engineering analysis, the police accident report, a traffic accident reconstruction report authored by someone named "Fricke," as well as photographs of the subject motorcycle and accident scene.[2] Baumann's "reconstruction" of plaintiff's accident indicates plaintiff's "loss of control and crash stem[med] from his being led through a turn by Buell's lead rider at an exceedingly fast and unsafe speed for his skill level and experience, coupled with the Buell motorcycle's strong and sensitive brakes, unusual handling geometry and [plaintiff's] unfamiliarity with the route and curves on Diamond Point Road." The problem with Mr. Baumann's opinion is that it is based on pure speculation. There are absolutely no facts in Baumann's affidavit concerning the action or speed of plaintiff's motorcycle at or before the time of the accident.

The conspicuous absence of any observations on the part of Baumann about plaintiff's speed is based on the undisputed fact that no one seems to have any idea of how fast plaintiff or, for that matter, any other rider was traveling prior to the accident. Assuming the truth of the various assertions concerning the "excessive" speed at various times by Buell's riders on Diamond Point Road, there is no evidence of what speed these riders were traveling at or immediately before plaintiff's crash. Moreover, even if the Buell riders were speeding, there is no evidence that plaintiff was also speeding or, if he was, that speed was a factor in causing his

---

[2] None of this supporting evidence is included with Mr. Baumann's affidavit or plaintiff's moving papers.

10

accident. In fact, aside from utter speculation and conjecture, there is no evidence in the record concerning the cause of plaintiff's accident. Timothy Reiseler, the only person who actually witnessed plaintiff's accident, said plaintiff "drifted" over to the opposite lane while attempting to negotiate a right hand curve. Although Reiseler claimed that he personally accelerated on the straight section of Diamond Point Road and the "factory riders" were traveling way in excess of the speed limit at various times during the two demonstration rides he participated in, Reiseler does not claim or even suggest that plaintiff was speeding prior to the accident.

To defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed.R.Civ.P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth "specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). A party cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible, *see, e.g., L & L Started Pullets, Inc. v. Gourdine*, 762 F.2d 1, 3-4 (2d Cir. 1985); *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983). Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("[T]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. "); *see, also Lisa's Party City v. Town of Henrietta,* 185 F.3d 12, 17 (2d Cir. 1999) (affirming grant of summary judgment where "appellant's assertion that the Town enforced the ordinance against it with an impermissible motivation [was] sheer 'conjecture and speculation'").

In the present case, Mr. Baumann assumes that plaintiff was speeding because it appears the lead and trail riders were speeding at various times and Baumann further assumed that

11

speeding was the cause of the accident even though there are no facts in the record which demonstrate the speed of any of the involved motorcycles at or immediately before the accident. The Court finds that Mr. Baumann's opinions concerning the proximate cause of plaintiff's accident, including the veritable laundry list of defendants' alleged "grossly negligent" conduct, are wholly speculative and conclusory.  Because there is no evidence in the record which explains why or how plaintiff's accident occurred, Mr. Baumann's attempt to link the accident to any act or omission on the part of defendants is pure conjecture.  Based thereupon, plaintiff's evidentiary submissions are insufficient to defeat defendants' entitlement to summary judgment.

### IV. CONCLUSION

For the forgoing reasons it is hereby

ORDERED that defendants' motion for summary judgment is GRANTED; and it is further

ORDERED that plaintiff's complaint is DISMISSED with prejudice.

IT IS SO ORDERED.

Dated: October 19, 2007
       Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge